But WILLIAMS, J., stopped him, saying he could not permit judgments to be taken in that manner; that he conceived the act to be unconstitutional; it was to condemn a man unheard. Bill of Rights, Art. 12, says: "No freeman ought to be taken, imprisoned, or disseised of his freehold, liberties or property, etc., but by the law of the land," and these words mean, according to the course of the common law, which always required the party to be cited, and to have day in Court upon which he might appear and defend himself. Sec. 14 declares that the ancient mode of trial by jury is one of the best securities of the rights of the people, and ought to remain sacred and inviolable. The ancient mode of trial by jury was that after the defendant was cited, and had pleaded, and the other party had denied his plea, or some part of it, then the point in controversy was submitted to the decision of a jury; but here, though a jury may be sworn, what will it be upon? It will be upon a default taken against the party who does not appear and plead, because he has no knowledge that any proceedings are intended to be had against him; and so in truth it is not a trial by jury according to the ancient mode. The defendant has no opportunity of making any defensive allegations which may be submitted to the decision of a jury; but the jury here are merely to pronounce what is the sum to be recovered, and in this they are to be governed by the report of the Comptroller, which is made evidence against the defendant by another act of the Assembly; so that in reality the jury have nothing to determine on — it is mere form for the sake of which they are to be impaneled. Such a trial is a mere farce. I think the act unconstitutional, and I cannot, as at present advised, give my assent to its being carried into effect. The judges of the land are a branch of the government, and are to administer the constitutional laws, not such as are repugnant to the Constitution. It is their duty to resist an unconstitutional act. In fact, such an act made by the General Assembly, who are deputed only to make laws in conformity to the Constitution, and within the *Page 51 
limits it prescribes, is not any law at all. Whenever the Assembly exceeds the limits of the Constitution, they act without authority, and then their acts are no more binding than the acts of any other (30) assembled body. Suppose, when met together, they should pass an act to continue the Assembly for two years — the Constitution says it shall continue but for one; and suppose in the second year they should pass an act — would the judges be bound to effectuate it? Surely not. No more are they bound to regard an act not made agreeable to the Constitution. I am alone on the bench. I am sorry to be obliged to prevent the execution of an act which the Legislature thought necessary to be passed, and no doubt might be of public utility. But what end is an equivalent for a precedent so dangerous as that where the Constitution is disregarded by the Legislature, and that disregard sanctioned by the judiciary? Where, then, is the safety of the people, or the freedom which the Constitution meant to secure? One precedent begets another, one breach will quickly be succeeded by another, and thus the giving way in the first instance to what seems to be a case of public convenience in fact prepares the way for the total overthrow of the Constitution — the surest palladium of our rights. I cannot consent to it; but the Attorney-General, if he pleases, may again move the subject when we have reflected a little more upon it.
Next day, at the sitting of the Court, Haywood, the Attorney-General, moved the subject again, as follows: The clauses of the Constitution that are objected to the validity of this act are declarations the people thought proper to make of their rights; not against a power they supposed their own representatives might usurp, but against oppression and usurpation in general. The second clause, for instance, could not be intended as a restraint upon the Legislature; it could not be supposed the Legislature would ever attempt to oppose the right of the people to regulate their internal government. It was intended to assert the right of the people against the power of the British King and Parliament, and against all other foreign powers who hereafter might claim a right, under any pretense whatsoever, of interfering with the affairs of this Government; and to serve as a standing and perpetual memento to posterity that the least intermeddling by any foreign power with the internal policy of this Government is an invasion of their privileges. Such, also, is the manifest meaning of section 5. Who were the convention suspicious of when they declared, "That all power of suspending laws, or the execution of laws, by any authority, without the consent (31) of the representatives of the people, is injurious to their rights, and ought not to be exercised"? This is not a restraint upon the legislative power of the Assembly. From the experience of what had *Page 52 
happened in older governments, they apprehended that in the vicissitudes of human affairs some ambitious men might usurp the power of dispensing with laws, or claim the right of exercising such a power. It had been frequently done in that government which they were the most intimately acquainted with, to the great oppression of the people. They also had other reasons. The event of that dangerous war in which they were then engaged was doubtful. In case of an adverse event, they were determined by this solemn declaration that the rights of the people should be proclaimed and handed down to posterity; that this solemn declaration should be a monument of them, to keep the genius of freedom alive, and to impel posterity, by this lesson left them by their ancestors, at some future day to erect again the standard of liberty. This I take to be the true meaning of the Declaration of Rights; and if we attend to the 12th clause, we shall find it was copied almost verbatim from the chapter 29 of Magna Carta, and of the occasion of which our Bill of Rights were very similar — the struggle of the people against oppression. This clause in both has nearly the same meaning. And then the spirit of this clause is in exact unison with the other clauses, not intended to restrain the Legislature from making the law of the land, but a declaration only that the people are to be governed by no other than the law of the land. Per legem terrae, were words used in the charter granted by Henry I., King Stephen, Henry II., King John, and Henry III., whose confirmation seemed finally to give stability to this charter; and this term, in those times, had a certain appropriate meaning which in latter periods came to be a little altered. In the three former of these reigns the term per legem terrae was employed in contradistinction to the civil law, then called the Italian law, having been lately discovered and adopted in Italy, and which had been, or were then begun to be, introduced in England in exclusion of the laws of Edward the Confessor, or, in other words, in the law of England. Henry I. in his charter promised, among other things, to confirm and observe all the laws of Edward the Confessor. 1 Goldsmith's England, 133 Stephen, his immediate successor, promised a restoration of the laws of Edward the Confessor in his charter. 1 Goldsmith's England, 145. These laws of Edward (32) the Confessor were the ancient laws, usages, and customs of the different parts of England, collected and digested into one code. 1 Bl. Com., 66; 4 Bl. Com., 405. It appears from the frequent stipulations contained in the charters of these times, promising to observe and restore these laws, that they had been neglected and some other law introduced in their place. Indeed, we are expressly informed of this in the preface to 8 Rep., page 8, where immediately after the author has been speaking of King Stephen's character, he says: "King Stephen forbade by public edict that no man should retain the laws of Italy, *Page 53 
formerly brought into England." In these times, therefore, the termlex terrae meant the English law in contradistinction to the laws of Italy, or of any other foreign country. And in like manner in our Constitution, where the Convention are declaring the rights of the people, and use the words of the Magna Carta of England, they mean to assert, in general, that the people of North Carolina have a right to be governed by their own laws, and not to be subject to laws made by any foreign power upon earth; in like manner as in the 2d clause they declare that the people of this State ought to have the sole and exclusive right of regulating the internal government and police thereof — by all which they mean to vindicate the sovereignty of this country, and the inherent right of the people thereof to govern themselves. The term lex terrae, in the times of Kings John and Henry III., began to have a meaning additional to what it had in the former reigns. These princes were guilty of great abuses under the pretense of prerogative. They had confiscated the estates of many of their subjects; they had exiled and destroyed many, also, by the power of prerogative. It is remarkable that in King John's charter it is stipulated that no freeman shall be taken, or imprisoned, or disseised of his free tenements and liberties, or outlawed, or banished, unless by the legal judgment of his peers, or by the law of the land, and all who suffered otherwise in this and the two former reigns shall be restored to their rights and possessions. I Goldsmith's England, 233. This plainly evinces that the words per legemterrae, here spoken of, import an acting by a pretended prerogative against or without the authority of law. 1 Goldsmith's England, 224, 225, 219, 220. And thus the term, law of the land, is to be understood in our Constitution, beside the meaning already ascribed to it, to declare that the people of this State are not to be deprived of liberty, property, the benefit of the law, nor exiled from their country, by any power whatsoever acting without or contrary to the established (33) law of the country, or by any proceeding not directed or authorized by that law. The meaning of the words lex terrae may, therefore, be thus shortly defined — a law for the people of North Carolina, made or adopted by themselves by the intervention of their own Legislature. This definition excludes the idea of foreign legislation, of royal or executive prerogative, and of usurped power; and leaves the power of inflicting punishments, or rather of passing laws for that purpose, in their own Legislature only. In this sense, the lex terrae of North Carolina at present is the whole body of law, composed partly of the common law, partly of customs, partly of the acts of the British Parliament received and enforced here, and partly of the acts passed by our own Legislature. 2 Inst., 46. If this body of laws is not the lex terrae designated in our Bill of Rights, but the common law only, then the common law is *Page 54 
immutable, and the Assembly cannot alter it by any legislative act. Should the Assembly in any instance attempt to alter any rule of property, with respect to its transmission, descent, etc., so as to entitle any other person to it than is entitled by the common law, he that is entitled by the rule of the common law may say, "No man is to be deprived of his property or rights, but according to the law of the land, or the common law." If an act not punishable by the common law, or punishable only in a smaller degree, should be rendered penal, or more penal than it was by the common law, by any legislative act, the party to be affected by it might say, "I am not to be imprisoned, or exiled, or disseised of my freehold, or in any manner destroyed, but according to the law of the land, or, in other words, the common law." It is easy to see into what a labyrinth of confusion this would lead us. It would contradict the very spirit of the Constitution, which in establishing a republican form of government must have been inevitably led to foresee the great alteration that the new state of things would make necessary in the great fabric of the common law; they must have intended such changes therein by the legislative power as would more perfectly adapt it to the genius of that species of government, many of the maxims of which are so diametrically opposed to all those of the common law which have any view towards the support of the kingly power or that of the nobles. Such a construction would destroy all legislative power whatsoever, except that of making laws in addition to the common law, and for cases not provided (34) for by that law. It would lop off the whole body of the statute law at one stroke, and leave us in the most miserable condition that can well be imagined. All capital punishments ordained by the statute law for murder, rape, arson, etc., would be done away, and every malignant passion of the human heart let loose to roam through the land, unbridled by fear, and free from all manner of restraint except those very ineffectual ones the common law imposes. This cannot, therefore, be the true meaning of the term law of the land, made use of in the Bill of Rights. It must be that which I have already contended for, or something very similar to it; and if that be the true meaning of the term, how do these words at all imply that the Legislature have not a right to pass such an act as that which is the subject of our present discussion? Do they not, on the other hand, prove that as this is neither the act of any foreign Legislature nor the arbitrary edict of any usurped power acting independent of the people, but the act of their representatives assembled for the purpose of legislation, and to consult together for the public welfare, is such an act as ought to be respected? Does it follow, because the Constitution hath declared the right of the people to be exempted from all foreign jurisdiction, and from all power acting independently of the laws, that their own representatives cannot *Page 55 
make a law which is useful and necessary for the public good? There is no part of this Constitution that directs the process by which a suit shall be instituted, or carried on, and the Legislature are therefore free to direct what mode of proceeding in courts they think proper; and accordingly, in a great variety of instances, both in England afterMagna Carta and in this country since the Constitution, judgments have been rendered against the defendants without their having had any previous actual notice, and the judges have never intimated a doubt of the constitutionality of these proceedings. I will instance in the case of statute merchant, statute staple, and recognizance in England. There, after the recognition and day of payment arrives, no process issues against the debtor to show whether he has paid or obtained a discharge, but execution issues without any further notice. I will instance in the case of outlawries: a man's whole property may be taken away, and yet he never may have had any actual notice of his appearance in court being required. Both before and since the Revolution in this country, and until 1783, bonds, called judgment bonds, were in use here, and many judgments were taken upon them, after the formation of this (35) Constitution, without any notice at all to the defendants, and the judges did not say it was an unconstitutional proceeding; and I suppose it would have been practiced to this day had it not been for the legislative interposition in 1783. See Rev. Laws, ch. 188. The necessity for this interposition proves that it was an inconvenience the judiciary could not remedy upon the ground of its unconstitutionality. Had it been such, as it was a public evil, the judges would most certainly have opposed to it the principles of the Constitution. I would instance in the case of the attachment laws: the property of an absentee is seized, judgment is obtained against him, and his property sold, when perhaps, and very probably, too, he has not the least intimation of it. The attachment law is a law of public convenience, but yet it is liable to all the objections which have been made to this act for taking judgments. Without any previous notice actually given to the defendant, a judgment by default is taken, and the jury is sworn to ascertain the quantum of damages, the defendant not being present, and indeed knowing nothing of it. Yet the validity of the attachment law was never questioned by the judges, nor did they, that I ever heard, express the least reluctance to its execution. If a bill in equity is filed, and the defendant cannot be found within the State, to be served with process, it is published in the Gazette that such a bill is filed, and if the party should not appear by the prefixed day, though he hath no actual notice, yet a decree is passed against him. If a judgment is obtained against the principal, and two sci fa's against the bail are returned nihil, here a judgment passes against the bail, though he has no actual notice of *Page 56 
this proceeding, and of course no opportunity to plead in his defense a matter to be submitted to a jury. All the confiscation laws lately passed in this country, what are they but proceedings to take away the property of absentees, who perhaps knew nothing of these intended proceedings? If to proceed to judgment before actual notice be given to the defendant be against this clause of the Constitution, how hath it happened that so many proceedings of this nature have been established by the uniform decisions and practice of the judiciary? It may be fairly inferred that all these are so many proofs that such a proceeding is not unconstitutional, and that the Legislature may enact such laws. But to obviate these objections in every shape, let it be granted, for the sake of (36) argument, that the phrase lex terrae in our Bill of Rights really means the common law, and that the common law requires notice to be given to the defendant before the plaintiff can proceed to judgment it also allows an exception to the rule when the defendant voluntarily renounces that privilege by the nature of his contract. It is one of the maxims of this very common law that Quilibet potest renunciare juri pro seintroducto. And maxims, being the foundations of the common law, when they are once declared by the judges, are held equal in point of authority and force to acts of Parliament. Wood's Inst., 6. The maxim that Quilibetpotest, etc., extends even to cases where the life of the renouncer is concerned; the accessory by renouncing his right not to be tried before the conviction of the principal may put himself upon his trial, and be hanged for it. 2 Inst., 501, 183. If the rule of renunciation extends thus far, it will hardly be contended that a man may not renounce some lesser advantage, such as the having of actual notice of the State being about to proceed to judgment against him. But if this point be established, yet the question recoils — have the receivers of public moneys in this State agreed to renounce this privilege? To prove that they have, we have nothing more to do than to refer to the several acts of the Legislature for the better security of the revenue, 1784, Rev. Laws, ch. 219. The Legislature directed judgments to be taken against delinquents by the Treasurer, in the name of the Governor, and declared that such judgments should be as valid as if the usual processes of law had been observed; the same, in effect, is repeated in 1787, Rev. Laws, ch. 269. Now, surely, every officer who hath received his appointment since 22 October, 1784, must be deemed to have taken it under the condition prescribed by these laws, and must in the very act of accepting the office have consented that in case of delinquency he would be subject to the operation of these laws; and is he not, then, as much bound as in the case of the judgment before mentioned? And I would remark that these acts of 1784 and 1787 were so far from being viewed as unconstitutional by the judiciary at first, that no scruple was ever entertained with respect *Page 57 
to them, from the time of passing the act of 1784 until some time in 1788, but in this interval judgments for the public were uniformly entered as the act directs, without actual notice to the defendant. The records of this court will verify the assertion, and the gentleman concerned for the State at that time can certify the same thing. [Mr. Moore was this gentleman, who was then present.] (37)
In 1788 a judgment was moved for, and the Court for the first time inquired if the defendant had been served with notice of the motion, and being answered in the negative, refused to give judgment. This determination was followed by a practice of giving notice, productive of enormous expense to the State.
In order to prevent this expense for the future, and to leave no doubt in the mind of the Court with respect to the will of the Legislature upon this subject, they have unequivocally expressed it in the most pointed terms in their act of the last session. Since 1784 there have been nine Assemblies of this State. The most of them have approved, some have amended this part of the revenue laws, and none has ever thought proper to repeal it. Would so many Assemblies, each of whom has done something upon the revenue business, have suffered those clauses to have remained unrepealed had they believed them to be unconstitutional? Are these legislative bodies, charged and entrusted by their countrymen with their most important concerns, to be all regarded as men who either could not discover the unconstitutionality of a law or were willing to countenance it? What interest have they in the continuance of an unconstitutional act more than the rest of their fellow-citizens? Had the clauses been repugnant to the Constitution, they would undoubtedly have repealed them. The Legislature, though frequently blamed, are undoubtedly in general entitled to this commendation, that they seek the good of their country; with men elected as they are, and for such a period, it can hardly be otherwise.
In doubtful cases the argumentum ab inconvenienti is of weight, and I conceive it may be properly introduced on the present occasion. If the inconvenience of declaring this act to be unconstitutional be considerable, I presume this consideration will not be entirely overlooked by the Court. It was to avoid great public inconvenience that this act was passed. The expense of sending a messenger to all parts of the State to give notice to delinquents cost the State annually not less than 1,000; and besides this, the parties well knowing it to be the duty of the Treasurer to take judgment after the first day of October in each year, either go out of the neighborhood or conceal themselves about the time when the messenger is expected, so that after traveling a great distance he frequently returns without seeing any of them; but he must still be recompensed for his services out of the public coffers. Sometimes he is *Page 58 
(38) fortunate enough to serve the notice upon one of several parties to a contract, and immediately some of the family are sent off to give notice to the others that the State messenger is about; the consequence of which is that he cannot see the others; and thus he returns, having served one only, who perhaps of himself is not able to satisfy the demand. Frequently the county courts take seventeen, or eighteen, or twenty sureties, in order to indemnify themselves. The messenger must serve all these with notices; to serve notice upon some of them only will not do; if they are to be charged jointly, they must all be proceeded against; and most frequently for the reason just mentioned, it is improper to proceed against any one of them alone. The public debtors also frequently move away into other states, so that notice cannot be served upon them; and if they have left any property which might be attached, the Treasurer, or his messenger, knows not where it is; nor do they generally receive any intelligence of the danger of the public debt till private creditors have swept away the whole property.
All these evils, so detrimental to the public, and which the Legislature have manifested so much anxiety at different times to remove, will still be continued if the Court should adhere to its opinion of yesterday; and, moreover, by such a decision the Legislature will be utterly deprived of every power competent to its remedy. It will be in vain for them to pass any act similar to the present, or to adopt any other mode but that of the old time, which has prevailed since the year 1788. At this time there are but a few hundred pounds in the Treasury, and the situation of public affairs renders it probable that the Legislature may be convened before the day of its usual meeting. How are they to be supported? Should the public emergencies require the advancement of any considerable sum, which is not improbable, how is it to be obtained if the public judgments are not now taken? Or how is the Treasury to be supplied for the expenses of the next meeting of the Assembly?
I do not urge the latter arguments as properly possession any such force as should have an influence in the decisions of a constitutional question, but only as reasons why we should carefully examined the question now before us before we proceed to reject this act entirely. While we are considering the permanent and remote consequences of such a decision, the immediate and transient one should not entirely be overlooked, especially as it may put a stop to the affairs of Government for some time, at this critical period when the approach of war is universally (39) expected.
It has been said, amongst other objections to the clause now in question, that this is a retrospective law. Does any part of our Constitution prohibit the passing of a retrospective law? It certainly does *Page 59 
not. The objection is grounded upon section 24 of our Bill of Rights, which prohibits the passing of an ex post facto law. This prohibition is essential to freedom and the safety of individuals. This is a declaration that no power whatsoever shall be entrusted with the arbitrary disposal of the lives of our citizens. If the whole people should become prejudiced against a fellow-citizen, he is not to fall a sacrifice to popular caprice or resentment. The representatives of the people shall not condemn him by any act of attainder, nor yet by declaring any former act of his to be now capitally criminal, or indeed more criminal, than it was at the time of its commission. Examples of popular frenzy exhibited in the ancient republics against some of the people's best friends pointed to the propriety of this regulation; and this clause, I admit, is in restraint of legislative power in this particular. This indeed prohibits the passing of a retrospective law so far as it magnifies the criminality of a former action, but leaves the Legislature free to pass all others and without such a power no government could exist for any considerable length of time without experiencing great mischiefs. The exercise of such a power has been found frequently necessary here since the Revolution, and divers retrospective acts which the Legislature have passed have been carried into execution and sanctioned by the judiciary. See Iredell's Rev. 276, sec. 24; 289, 318, sec. 100; 386, sec. 4; 424, 454, 463, 487, 489, sec. 5; 573, secs. 6, 7, 9, 10, 11, 16. The fact is, the affairs of Government will sometimes, nay, often, require the exercise of this power. These instances may serve to show the necessity of it. And it is not like an ex post facto retrospective law any way incompatible with the safety of a free people. The Convention foresaw the necessity there would be for sometimes enacting such laws, and therefore they have been careful to word section 24 so as not to exclude the power of passing a retrospective law, not falling within the description of an ex post facto law. The Convention meant to leave it with the Legislature to pass such laws when the public convenience required it. I will not stir this point any further, but conclude with expressing my hope that the Court will suffer us to take judgment.
WILLIAMS, J., still adhered to his opinion of yesterday, giving (40) nearly the same reasons he then gave.
At Halifax Court, a few days after, the Attorney-General again moved the Court, consisting of ASHE and MACAY, JJ., and stated to them the arguments which had been used at Hillsboro. After hearing him the Court took time to advise for a few days; when the matter being moved again, ASHE, J., gave the opinion of the Court, saying he and MACAY, J., had conferred together; that for himself he had had very considerable doubts, but that MACAY, J., was very clear in his opinion that the judgments might be taken, and had given such strong reasons that his (ASHE, *Page 60 
J's.) objections were vanquished, and therefore that the Attorney-General might proceed — but that yet he did not very well like it. So the judgments were taken.
See Bank v. Taylor, 4 N.C. 20; S. c., 6 N.C. 266.
Cited: Hoke v. Henderson, 15 N.C. 16; Worth v. Cox, 89 N.C. 48;Wilson v. Jordan, 124 N.C. 715.